·THOMAS McPEAK, Appellant, *v.* THE NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, Respondent.

*Nonsuit — claim for personal injuries — evidence as to the rate of speed of a locomotive, in violation of an ordinance, is for the jury — contributory negligence in not looking for the train.*

Upon an appeal from a judgment entered on a nonsuit, the appellant is entitled to have all of the evidence construed in a manner most favorable to his contention, as well as to have the benefit of the inferences which can legitimately be drawn from such evidence.

Upon the trial of an action brought to recover damages sustained by reason of the defendant's alleged negligence, whereby the plaintiff was run down by a steam locomotive, it is for the jury to determine what force and effect should be given to the evidence that the passenger train was approaching the street crossing in a city where the accident occurred at a greater rate of speed than was permissible under an ordinance of the city.

The fact that it was shown upon the trial of such action that the plaintiff, under some circumstances, could have observed an approaching engine for a distance of 229 feet, is not sufficient to require the court to rule, as a matter of law, that the plaintiff was guilty of contributory negligence. If the plaintiff testified that he looked both ways before attempting to cross the tracks, it is for the jury to determine upon such testimony as exists in the case whether his conduct on the occasion was that of a person using ordinary care and prudence.

If in case of an accident at a railroad crossing, it appears that the person injured did look for an approaching train, it would not necessarily follow, as a rule of law, that he was remediless because he did not look at the precise place and time where and when looking would have been of the most advantage

APPEAL by the plaintiff, Thomas McPeak, from a judgment of the Supreme Court in favor of the defendant, entered in the office of the clerk of the county of Oswego on the 27th day of November, 1893, upon the dismissal of the complaint, directed by the court after a trial before the court and a jury at the Oswego Circuit, and

also from an order entered in the said clerk's office on the 26th day of October, 1893, denying the plaintiff's motion for a new trial made upon the minutes.

The action was brought to recover damages sustained by the plaintiff, who lost an arm on the 2d of April, 1892, by being struck by an engine of the defendant while about to cross Fourth street in the city of Oswego.

*W. A. Poucher* and *William Tiffany*, for the appellant.

*D. G. Griffin*, for the respondent.

HARDIN, P. J.:

Inasmuch as a nonsuit was granted the appellant is entitled to have all of the evidence construed in a manner most favorable to his contention, as well as to have the benefit of the inferences which could legitimately be drawn from such evidence. (*Harris* v. *Perry*, 89 N. Y. 308; *Sherry* v. *N. Y. C. & H. R. R. R. Co.*, 104 id. 656; *Morrison* v. *The Metropolitan Telephone Co.*, 52 N. Y. St. Repr. 603; S. C., 69 Hun, 100.)

The defendant's track where the accident occurred crosses Fourth street and passes along Schuyler street. On the occasion of the accident one of defendant's freight trains was stalled in its approach to Fourth street, and while crossing it, about nine-fifty o'clock P. M. The track was wet, and as the train approached Fourth street it was passing around a curve, and there was some difficulty found in getting the use of the contrivance for depositing sand upon the track to prevent the wheels from slipping. A great noise was made by the engine that was attempting to get the freight train in motion. Holman, the engineer on the freight train that got stalled, said : "We stopped there about nine-fifty o'clock on account of a bad rail. We didn't have a very high pressure of steam. The engine was slipping bad. We stopped about four minutes, and put on the blower, and began to take in slack; three or four minutes. Took the slack of the train and pulled them a little ways, and stalled again. Took slack again and started the train, and pulled them out very slowly. The second time we took slack we stopped just long enough to get slack; about two or three minutes. Our engine was supplied with sand. I was using it. It was on a curve,

and she wasn't getting sand the way she ought to.  Only on one side.  Sometimes the sand pipe gets off the rails, and it don't work just right.   *   *   *   The noise was the sudden exhaust; quite a noise, sudden, following each other; short exhaust;   *   *   *   it was a continuous noise, a kind of blowing noise out of the stack.  *   *   *   The cause of this stalling were an insufficiency of steam and slippery rails and the curve combined.  These three causes caused us to get stuck there."   Defendant's witness Buskey, who was the head brakeman on the freight train that got stalled, says : " The engine was exhausting steam when we tried, and when we didn't try they had the blower on, and had a kind of humming noise through the stack of the engine.  The blower makes that humming noise.   *   *   *   That is the worst noise — the most difficult to hear when you are near it of any noise the engine makes.  I guess it is the most difficult to hear when you are near the noise, more difficult than it is any other noise which the engine makes.   *   *   *   I call that noise a kind of humming noise.  It is when you are trying to get steam.  It is when the blower is on.  It is a continuous humming noise.   *   *   *   No cessation at all.  Whenever we were not trying to go ahead that noise existed.  And when we were trying to go ahead we were exhausting."   Plaintiff was traveling north towards the Fort grounds when he reached the Fourth street crossing, where he found standing across the sidewalk a freight train headed west, stalled.  There were two other tracks which were not occupied at the time the plaintiff approached the road, one known as the south track and the other as the middle track.  The plaintiff was approaching the crossing with his friend Ward, and testifies as follows : " I got down on to the crossing; stood there for perhaps for about two or three minutes, when I first stopped.  I looked both ways to see if there was any train coming along; went over a little further and looked again.  I saw a freight train stalled there on the north track; might have stood there perhaps a quarter of a minute.  I looked both ways; I looked east first; turned around and looked to the west to see if I could get by that train — if it was cut in two any way so I could get around either end of it — to see if there was an opening.  I found I couldn't get around it.  I stepped back again.  I should say I was about two feet from the north rail of the middle track looking east when this passenger train (going west on middle

track) came along and struck me and knocked me I should say about ten feet, and threw me over on my back. My arm went out and it took it off. The engine of the freight train was puffing and blowing off steam so I couldn't hear anything coming. I couldn't hear the passenger train; didn't see it till I was struck. The engine of the freight train stood, I should say, about twenty feet from the crossing, perhaps thirty feet west. The tail of the train extended easterly. The cars that confronted me when I came up were box cars, a freight train of box cars. I was struck and my arm run over by the passenger train on the middle track, on the north rail just where the point of the track comes together" (meaning the frog of the switch on middle track just west of the sidewalk).

Plaintiff was an enlisted soldier stationed at the fort near by, and had occasion to pass and repass the crossing two or three times a week and sometimes two or three times a day. When he reached the crossing about nine-fifty it was dark and cloudy. There was some evidence to the effect that on the night in question a passenger car was standing on the south track east of Fourth street and about opposite the Connor House. There was an electric light near the crossing. Defendant called an engineer who had made measurements of the premises, and from his testimony it is claimed there was no obstruction to the plaintiff's view of the headlight of the approaching engine for a distance of some 229 feet just before the accident, and that he could have obtained a view of the headlight of the engine at a distance of 421 feet before it reached him, although there were intervening cars on the south branch that interrupted the light afterward and until the engine got within a distance of 249 feet. And there was evidence tending to support the position that an electric light illuminated the vicinity where the accident occurred. It appeared that there was an ordinance of the city prohibiting the defendant from running its trains at the place in question faster than six miles an hour. There was evidence given tending to show that the speed of the passenger train as it came up Schuyler street was from eight to ten miles an hour. Defendant called McCarthy, the engineer of the passenger train, who testified that it was a dark night, and that the headlight of his engine was burning at the time and that he saw the rear end of the freight train on the right-hand side of him, to

wit, on the north track, when the rear end of the freight was about Sixth street, and that he slowed up his train and came along a little further, and that just before he got where the accident occurred he saw a man on the top of the gondola standing there with his back toward him, and that he got up a little further just about in front of him, and that he jumped off with his back toward the witness, and just as he fell the witness' engine hit him, and that the brakes were applied and the train stopped, and that as he was getting down from the engine the plaintiff was standing in front of him by the gangway, and that the plaintiff remarked " nothing but an arm off." In response to the testimony given by the defendant the plaintiff testified that he did not on the night in question get on to any car on the freight train, or attempt to get on any, and that he didn't jump off a car of the freight train upon that night or fall from it or come from it in any way, and that he didn't state to any one that he expected any one on the passenger train. That he didn't state on that night that he jumped from the freight train or anything substantially of that character. He further testified : " This exhaust of the engine of the freight train or the blower making its noise, one or the other, was being done during the entire time, from the time I arrived there at the crossing to go home that night until the accident. I heard no bell or whistle on the passenger train. I plainly heard this exhaust and this blowing from the engine during the whole time. The blower made a kind of rumbling sound ; loud." Upon the evidence of all the circumstances attending upon the acts and omissions of the defendant on the occasion of the accident, we think the question of defendant's negligence was one of fact which should have been submitted to the jury. It was for the jury to determine what force and effect should be given to the fact, if so found from the evidence, that the passenger train was approaching the crossing at a greater rate of speed than was permissible under the ordinance of the city.

In *Beisegel* v. *N. Y. C. R. R. Co.* (14 Abb. [N. S.] 29) it was held that " It is some evidence of negligence as to third persons, on the part of a railroad company, to show that it ran its engine through the streets of a city at a speed greater than is permitted by a city ordinance, although the ordinance prescribes only a penalty for a violation of its provisions." In that case the trial judge

charged the jury " That if they were satisfied from the evidence that the engine was so running at the time, and this excess of speed beyond what the ordinance permitted contributed to the injury received by the plaintiff, it was some evidence of the negligence of defendants ; " and the court sustained the charge in an opinion delivered by GROVER, J.

In *Massoth* v. *D. & H. C. Co.* (64 N. Y. 532) it was held that city ordinances of the character of the one produced in this case are competent on the question of negligence of railroad corporations, and that the proof of greater rate of speed than that prescribed, with all the other evidence in the case, is to be submitted to the jury. It was also held in that case that, " irrespective of any ordinance or law regulating the speed of railroad trains at crossings, the running at an excessive rate of speed is negligence, and if a collision is caused thereby, the company is liable." And it was further said that " as to whether the rate of speed is excessive or dangerous in the locality is a question of fact for the jury."

Whether the plaintiff was guilty of contributory negligence was a question of fact which should have been submitted to the jury. Plaintiff testified that he looked, listened, used his eyes and made an effort to apprehend whether the place at which he found himself was one of danger or of safety. The fact that a person under some circumstances could observe an approaching engine for the distance mentioned by the testimony was not sufficient to require the court to rule as a matter of law that the plaintiff was guilty of contributory negligence.

In *Massoth* v. *D. & H. C. Co. (supra)* it was said : " It does not necessarily follow from the fact that a skilled engineer can demonstrate that from a given point in a highway the track of a railroad is visible for any distance, that an individual in charge of a team approaching the track is negligent because he does not from the same point see a train approaching at great speed in time to avoid a collision."

In *Shaw* v. *Jewett* (86 N. Y. 616) the court was asked to charge " that if they believed that the plaintiff could have seen the train at distance enough from the track to have stopped his horse before reaching the track, his failure to see the train was negligence on his part, and he was not entitled to recover." The court refused to so charge,

and it was held that the refusal was not error, and in the course of the comments delivered thereon by FOLGER, Ch. J., he said : " That is not the rule. The plaintiff is not bound to see ; he is bound to make all reasonable effort to see, that a careful, prudent man would make in like circumstances. He is not to provide against any certain result. He is to make an effort for a result that will give safety ; such effort as caution, care and prudence will dictate." That doctrine was approved in *Rodrian* v. *N. Y., N. H. & H. R. R. Co.* (125 N. Y. 529), and applying it to the case in hand it must be said that according to the plaintiff's testimony he looked both ways, and it was for the jury to determine upon such testimony as is found in the case whether his conduct on the occasion was that of a person using ordinary care and prudence. The question was one for the jury, and not for the court. (*Parsons* v. *N. Y. C. & H. R. R. R. Co.*, 113 N. Y. 355 ; *Towns* v. *R., W. & O. R. R. Co.*, 28 N. Y. St. Repr. 126 ; *Rodrian* v. *N. Y., N. H. & H. R. R. Co.*, 125 N. Y. 529 ; *Sherry* v. *N. Y. C. & H. R. R. R. Co.*, 104 id. 652 ; *Chisholm* v. *State*, 141 id. 246.)

Respondent calls our attention to *Burke* v. *N. Y. C. & H. R. R. R. Co.* (73 Hun, 32), which is unlike the case before us, as there it appeared " that the deceased could have seen this train and could have avoided it if she had used her eyes for the purpose for which they were intended ; " and there was no evidence that they were so used, and it was held that it was error to refuse to charge that the deceased was bound, in virtue of the evidence in that case, to turn her head and look for the train before entering upon the track. We think the language of ANDREWS, J., in *Rodrian* v. *N. Y., N. H. & H. R. R. Co.* (125 N. Y. 529) should be applied to the case in hand. He there said : " If, in case of an accident at a crossing, it appears that the person injured did look for an approaching train, it would not necessarily follow, as a rule of law, that he was remediless because he did not look at the precise place and time when and where looking would have been of the most advantage." The judgment in that case was reversed because of a defect in the proof. At a later part of the opinion it is said : " There is not the slightest evidence that she looked up or down the track before attempting to cross, or stopped or listened, the only evidence being that she appeared to be looking directly in front of her."

114  PEOPLE ex rel. READ *v.* TOWN AUDITORS.

FOURTH DEPARTMENT, FEBRUARY TERM, 1895.  [Vol. 85.

We think the trial judge fell into an error when he withheld the case from the jury, and the judgment and order should be reversed and a new trial ordered, with costs to abide the event.

MARTIN and MERWIN, JJ., concurred.

Judgment and order reversed and a new trial ordered, with costs to abide the event.